Good morning, Your Honors. May it please the Court. My name is Meredith Nixon, appearing on behalf of Petitioner Adam Vodnor. At its heart, this case is about growing pains and how immigration judges should evaluate country reports for emerging democracies. As recent global events have shown, having free elections does not create a democracy or eliminate human rights abuses. Elections are the product of democratic ideals. They do not create democratic ideals. This is extremely evident in this case, where the democratically elected government of Romania has consistently failed to uphold basic human rights for members of certain minority groups. Mr. Vodnor is ethnically Hungarian, a group that has been persecuted and scorned in Romania for years. The record shows that he has suffered persecution and numerous beatings because he is Hungarian, because he supports a Hungarian political party, and because he opposed the inhumane treatment he has received at the hands of Romanian security forces. Nevertheless, the agency denied Petitioner relief from removal based on grounds that his claim was inconsistent with country reports and that he could reasonably relocate within Romania. Both of these holdings have zero support in the record. Mr. Vodnor testified about five specific incidents of persecution he suffered at the hands of Romanian youth and Romanian police. He was beaten several times by Romanian youth because he was speaking Hungarian. The country reports document incidences of xenophobic nationalism among Romanian youth, which were further inflamed during the 2000 elections and the success of the nationalist PRM party. On two occasions, police were present at these beatings, but either did nothing or participated in the beatings. There are numerous instances in the Amnesty International and Human Rights Watch reports documenting beatings, false arrests, and trumped-up charges by police forces. On another occasion, Mr. Vodnor was attacked while posting flyers for the Hungarian UDMR political party in the 2000 election. Romanian youth tore down his flyers, and when Mr. Vodnor asked police for help, they arrested him for littering. They took him to the police station, beat him severely, and would not release him until he paid a large fine. Amnesty International and Human Rights Watch both report and document numerous instances of police beating people while in custody and forcing their families to pay large bribes for their release. Every specific incident of persecution presented by Mr. Vodnor is supported by evidence in the country reports. All of these experiences unfolded in a context of rising ethnic tensions based on a history of ethnic animus towards Hungarians in Romania. In addition, he presented six declarations from family, friends, and his doctor, showing that he suffered persecution on protected grounds. The I.J. did not dispute this specific evidence or discredit it for problems of demeanor, consistency, or falsehood. Instead, the I.J. uses general country condition reports to dispute the Petitioner's specific evidence. It's an entrenched legal principle that general country reports are not an adequate ground for dismissing specific evidence unless the country reports are inconsistent. Sotomayor, didn't you just use the same reports? The first part of your argument was all about how these reports and so on and so forth all prove that this guy is telling the absolute truth. You just did it. The first part of your argument was just about outside reports, and you're saying, see, that proves that he's telling the truth. Well, Your Honor, and you come around and say, oh, but you can't use those. I'm sorry, Your Honor. Your Honor, I was addressing the reports to provide a context for addressing specific incidences of abuse, which is the way that we use the country reports. Isn't that what the I.J. did in this case, to use them as background, as context for assessing whether the particulars were believable and were consistent with the context in which this person was living? Actually, Your Honor, that's what he said he was doing. But if you read his decision in detail, you can see that he actually says later that he did not find any specific incidents of the exact same abuse happening to anyone else mentioned in the reports. Well, in fairness, though, the report gives a much rosier picture than your pieces of it. It is not as bleak as you are portraying it to be. So if you can rely on your ‑‑ I guess this is like Judge Duffy's question. If you can rely on the, you know, one-eighth of it that's to your advantage, why can't he rely on the seven-eighths that is more favorable to the position of ethnic Hungarians in Romania? Well, Your Honor, actually, I think he relies specifically on the State Department reports, which I think, you know, other circuits like the Seventh Circuit have understood always paint a rosier picture of conditions in countries which the United States is seeking to have democratic relations with ‑‑ sorry, diplomatic relations with. And I think that what we're trying to do here is look at the reports as a whole. And as a whole ‑‑ Well, it sounds like you're doing two things. One is asking us to adopt a new legal rule that the State Department country reports are not themselves reliable or probative. We don't have that rule now, do we? We don't. I was mentioning it for your clarification and what our sister circuits have said about State Department reports. Oh, we haven't. It's evidence like any other evidence in the record under current Ninth Circuit precedent. So why can't it be part of the picture? Are you disputing the fact, for example, that there is the Democratic Union of Hungarians, a political party there in Romania, and that they are members of the present ruling government? They are. But if you look at the reports as a whole, they show that the success of that party was also paralleled by the success of a nationalist xenophobic Romanian party, and that both of those incidences, Hungarians asserting their political rights and xenophobic nationalism, resulted in increased persecution of Hungarians after the 2000 election. There were rallies supporting to expel Hungarians from Romania. Local officials denied certain laws regarding language rights, religious rights, with returning churches. All of these incidences paint a general picture of ethnic tensions in Romania. And I think that what the IJ did was pick out specific minor political successes and use them to say that there are no more ethnic tensions, and this is just false. It's not reflected in the record. And I think that, you know, this Court has also held that the fact that elections are conducted and that certain parties elect members to a parliament doesn't necessarily mean that other members of that party aren't persecuted. That's the Shaw case. And also, I think, you know, in the Rajinder Singh case, this Court held that you can't extrapolate from the country condition reports. You read them as a whole. And the fact that, you know, just because something isn't mentioned in the report doesn't mean that it didn't happen. And we've seen here all through the reports there are instances of police abuse and misconduct, the police act with impunity, and the Romanian government is complicit in all of this. I think that the record really compels a finding that there are ethnic tensions in Romania, that ethnic minorities are persecuted in Romania, that police officers persecute minorities in Romania, and that they get away with it. And this is basically everything. This totally parallels the evidence that Mr. Vodnar presented and his specific instances of persecution. Furthermore, the IJ, in an alternative finding based on crediting the Petitioner's testimony, said that he could relocate within Romania because his problems were purely local. I think that it's clear that when a Petitioner has demonstrated past persecution, that persecution, there's a presumption that that persecution is countrywide. And shifting that burden back to the Petitioner, saying that he has to prove that his problems weren't purely local, that shifts the burden away from its proper source, where the government has to prove that the persecution wasn't countrywide. Furthermore, the IJ never addressed the reasonableness of relocation or whether it would be safe for the Petitioner to do so. I think both of these holdings were in error. They're not supported by substantial evidence, and the record compels an alternative finding. If the panel has no more questions, I'd like to reserve the remaining time. You may. May it please the Court, my name is Elizabeth Cook, and I represent the Attorney General. In this case, the immigration judge correctly determined that Mr. Vodnar failed to meet his heavy burden with respect to his claims for withholding of removal and relief under the Convention Against Torture. Counsel, the main reason for not believing the applicant in this case seems to be that the documentation about country conditions, not just the State Department, but Amnesty International, Human Rights Watch, et cetera, did not contain similar stories. But doesn't the applicant have to show only that something bad happened to them? Does it matter whether the same thing has happened to someone else or not? Well, I think that in this case, the IJ actually explicitly found that Mr. Vodnar's testimony was, quote, highly implausible. Right. But the reason, the underlying reason primarily was that he'd read 200 pages of source documents, and they didn't, they seemed to show only that gypsies were persecuted and Romanis were persecuted and other people, but he didn't see that other Hungarians were persecuted, and therefore, he didn't believe it, which takes me back to my initial question. Does he have to show that, to be credible, that other people have suffered the same problem? Well, I think that, first, the IJ did conclude that Mr. Vodnar's testimony suffered from a fatal inconsistency. Which was? Well, on the one hand, he alleged that he would be in reasonable fear of persecution on a countrywide basis, should he return, and that he was in reasonable fear of persecution on a countrywide basis, that Hungarians were harassed and that the problems were pervasive throughout society. This is Mr. Vodnar's testimony. On the other hand, with respect to the specific incidents, particularly the 2000 incident, Mr. Vodnar testified to the contrary, that the reason he was threatened with exile by these two local police officers was because they were afraid of being a – they were held accountable by their chain of command. And that is the fundamental inconsistency that the IJ found with respect to specific incidents. So you have a specific finding that Mr. Vodnar failed to provide credible testimony that he had either suffered persecution on account of either his Hungarian fundamental inconsistency, that he claimed he was in reasonable fear of persecution, but yet these two police officers were themselves accountable to their superiors. And that's the fundamental inconsistency. Why is that inconsistent? I guess I don't – it doesn't leap to my mind, and I must – I'm missing the link. And if you could help me, I'd appreciate it. Well, I think in the immigration judge's view, the link is that Mr. Vodnar testified in a specific incident that he was threatened with exile by these two police officers because they, in turn, were afraid of accountability in the system, and throughout the – that there is a system in place that the government holds its police officers accountable. Mr. Vodnar also testified in numerous occasions through his – through the record that, in fact, Hungarians can't get a fair chance, that they are harassed, that there is no system in place. And that is the fundamental inconsistency here, that he both testified that there is accountability and there is not accountability. And then the immigration judge looked to the country reports to look at the generalized statements. So, for example, Mr. Vodnar claimed that he was threatened with forced exile. But if you look through the country reports, the country reports state conclusively repeatedly that exile is not used, exile has not been threatened, there are no reports of exile, that you have these – this is like the issue. But, see, that's very worrisome to me, because it suggests that if a, you know, a local police department comes up with a new and clever way of persecuting someone, they can never get asylum because there aren't previously published reports of the same thing. And that isn't the law.  GOTTLIEB But I think you would only reach that question if you did not have the predicate finding that the IJ did, which was that there was internal inconsistencies in Mr. Vodnar's story itself. MS. GOTTLIEB Well, that's true, if you just disbelieve the person that the things happened at all. But I guess I'm looking at the broader question of whether whoever is the first one to be But I think then you would be looking as to whether or not you fall into, for instance, a Shah situation or do you fall into a Chubchuk situation, and I apologize for the pronunciation of that. It would only be if you have some sort of predicate finding that you then look to the country reports. And I don't think you would get into a situation where the first to report would be in – would be automatically barred or would face an adverse credibility finding. It is the case law in this circuit that if you have an adverse credibility finding, certainly, and that's what we have here, then the absence of corroborative evidence, the absence of other reports in the country reports can also be considered by the – by the IJ in determining whether the Petitioner has met his or her burden of showing past persecution and a reasonable fear of future persecution. But I would also like to turn, unless you have other questions on that score, to the fundamental question of past persecution and whether or not Mr. Votnar met his burden of showing past persecution. This Court has been quite clear that you have to show a level of harm, that the persecution must be on account of either a political opinion or ethnicity in this case, and it is a level of harm that the government is unable or unwilling to control. In this case, Mr. Votnar has, in a somewhat shifting manner, alleged that he was persecuted on account of his political opinion, be that his membership in a party that is now part of a ruling coalition, or in this claim that he was persecuted on account of his – his raising issues with police brutality. But there is no evidence in this record that Mr. Votnar was persecuted on account of his having raised issues with police brutality. In fact, what you have is evidence that he went to police to complain about rowdy Romanian youths, and that the one – the few times that he did go to the police, he complained about specific incidents of conduct. And when he went to the police, for instance, in 2000, those two police officers felt that they were accountable of the chain of command. So if you look at situations like Grava or if you look at a situation like Hassan, you do not have criticism of a, quote, powerful political leader, and you do not have a challenge to a policy of a government official that is prevalent throughout the entire country. There simply was no showing that the persecution was on account of a political opinion as that has been understood by this Court. As for the question of whether or not the – the – Mr. Votnar has shown that he was persecuted on account of his Hungarian ethnicity, the – the record is not – certainly does not compel the conclusion that Mr. Votnar was, contrary to the IJ's credibility determination, subject to persecution on account of his Hungarian ethnicity. And finally, moving to the question of relocation, this has come up under the – under the Convention Against Torture. That would be part of the affirmative case. So regardless of whether or not the immigration judge shifted the burden or not, the – the finding that relocation would be reasonable is supported by substantial evidence, and it is, in fact, part of Mr. Votnar's opening case that he must make. Moving to the withholding of removal, we would submit that the IJ did, in fact, shift the burden to the government, because if you look at the opinion when he refers to whether or not the clear probability has been shown, he refers specifically to Mr. Votnar's burden. He then, on the next page, addresses the issue of relocation and does so by discussing the entire record. He does – this is classic language of burden shifting, so he may not have used the exact words, but he did, in fact, shift the burden, and he looked at factors like the societal conditions. He looked at factors such as that the sister, the mother, still lived there. He has family there. He has friends there. He looked at the social tensions and determined that the social tensions with respect to Hungarians are primarily focused on issues like language and education, as opposed to, for instance, the Roma, who are subject to beatings, forced relocation. But there – and so the IJ did consider these types of factors that are appropriate in the reasonable relocation factors. If there are no questions. Roberts. Thank you. Roberts. Thank you. Very briefly, Ms. Nixon. Thank you, Your Honors. I think that it's clear in the record here that the IJ mischaracterized the country reports and used that mischaracterization to deny relief. The abuse that Mr. Votnar suffered, the way his difficulties unfolded, beatings, extortions, police acting with impunity, all of this is unassailably widespread and is consistent in the context of ethnic tensions. And it's also plausible that the applicant will suffer persecution, at least in part based on his Hungarian ethnicity, as minorities are persecuted in Romania. I think that the – sorry, just to wrap up, anything you'd like to submit based on? Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Graber, Duffy